IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**DAVID E. WILLIAMS,**          )
                               )
                **Plaintiff,**  )
                               )
**vs.**                         )          **Civil No.**  14-cv-768-SMY-CJP
                               )
**CAROLYN W. COLVIN,**          )
**Acting Commissioner of Social Security,**  )
                               )
                **Defendant.**  )
                               )

## MEMORANDUM and ORDER

**Yandle, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff David E. Williams is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB), Supplemental Security Income (SSI) and Disabled Widower's Benefits (DWB).

## Procedural History

Plaintiff applied for benefits on August 30, 2010, alleging disability beginning on May 31, 2007. (Tr. 16). Plaintiff subsequently amended his onset date to February 11, 2010. (Tr. 38). After holding an evidentiary hearing, ALJ Kathleen Thomas denied the application for benefits in a decision dated December 20, 2012. (Tr. 16-28). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed within this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred by failing to recognize the onset date of disability was amended and considered immaterial evidence as a result.

2. The ALJ erred in assessing plaintiff's cervical, left arm, and left hand impairments.

3. The ALJ failed to consider the combined effects of plaintiff's impairments in forming the RFC.

## Applicable Legal Standards

To qualify for DIB, SSI, or DWB, a claimant must be disabled within the meaning of the applicable statutes.[1] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3).

---

[1] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. For all intents and purposes relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. The regulations pertaining to DWB are found at 20 C.F.R. §§ 404.335 and 404.337. The definition of disability is the same for DIB. See, 20 C.F.R. § 404.335(c), incorporating the definition of disability set forth in the DIB regulations into the DWB regulation. Most citations herein are to the DIB regulations out of convenience.

"Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled… If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## Decision of the ALJ

ALJ Thomas followed the five-step framework described above. She determined plaintiff had not been engaged in substantial gainful activity since the date of his application. She found plaintiff had severe impairments of degenerative disc disease, seizure disorder, psychotic disorder, adjustment disorder with mixed emotional features and bipolar disorder, anxiety-related disorder, personality disorder with antisocial features, and substance addiction disorder. (Tr. 18-19).

The ALJ found plaintiff had the residual functional capacity (RFC) to perform work at the light level, with physical and mental limitations. The ALJ found plaintiff had no prior relevant work. Based on testimony of a vocational expert, plaintiff was not disabled because he was able to perform other work that exists in significant numbers in the national economies.

## Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

1. **Agency Forms**

Plaintiff was born on February 11, 1960 and was fifty years old at his alleged onset date. He is insured for DIB through December 2026 and his "prescribed period" for eligibility for DWB ended on January 31, 2014. (Tr. 210). He was six feet tall and weight one hundred and eighty-five pounds. (Tr. 223). Plaintiff obtained a GED and a food service certification. (Tr. 224).

Plaintiff claimed that cirrhosis of the liver, Hepatitis C, depression, bipolar disorder, seizures, neck pain, left arm pain, anxiety, panic attacks, and paranoid schizophrenia made him unable to work. (Tr. 223). Plaintiff's last work attempt was in the spring of 2010 when he worked for two weeks at a factory. (Tr. 222).

Plaintiff submitted function reports in October 2010 and February 2011. (Tr. 232-39, 253-60). He lived in a house with family members and did very few chores. (Tr. 232, 234-35). He reported that his neck constantly hurt, he had seizures, he was unable to use his left arm, and he had severe anxiety attacks daily. (Tr. 232).

Plaintiff said he had trouble lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, using his hands, remembering, concentrating, and getting along with others. (Tr. 237). He took Celexa for depression, Clonazepam for anxiety, Lortab for pain, Nuvane for schizophrenia, and Cogentin to help manage side effects. He stated his medications made him dizzy, tired, and nauseated. (Tr. 266).

In October 2010 plaintiff's son, daughter, and son-in-law submitted seizure description forms. (Tr. 241-43). They claimed to have witnessed plaintiff experience

over twenty seizures. They stated plaintiff lost consciousness, thrashed, and his eyes rolled back in his head. (Tr. 241-42).

### 2. Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing on November 5, 2012. (Tr. 37). He testified from Menard Correctional Center by teleconference. Plaintiff testified that he had a GED and completed a four hour college credit course from Southwest Illinois College. (Tr. 41). He attended Alcoholics Anonymous meetings twice a week and planned on attending lifestyle change and advanced drug counseling classes. (Tr. 43).

Plaintiff was incarcerated for illegally selling his prescription medications. He stated that he was unable to pay for his living arrangements and sold his medications to a neighbor to help cover his expenses. (Tr. 51). He was supposed to be released from prison in 2013. (Tr. 52).

Plaintiff testified that he had severe neck pain that impaired his sleep. He stated the neck pain often caused headaches and went into his left shoulder and arm. (Tr. 44). The fingers on his left hand tingled and he was unable to lift his left arm higher than his waist. (Tr. 44-46). He stated he could not hold a glass of water with his left hand and he was unable to make a fist with his right hand. (Tr. 44-46). His left foot frequently felt as though it was asleep and it caused him to stumble often. (Tr. 44). Plaintiff stated he had testing performed on his legs that led to a bottom bunk order and a recommendation to avoid stairs. (Tr. 46-47, 50, 59).

While at prison, plaintiff testified that he was assigned to work in a kitchen. He dropped a hot pan of water due to his inability to maintain a grip and was thereafter issued a no work order from the prison doctor. (Tr. 45). Five years prior to the hearing plaintiff was robbed and hit on the head with a baseball bat. He stated he was put in a critical care unit for five days and began having seizures. Plaintiff testified that it had been "some time" since he last had a seizure. (Tr. 48).

Plaintiff had Hepatitis C and underwent interferon treatment several years prior. His wife passed away due to Hepatitis C which caused him to worry about death. (Tr. 47). He also began to hear voices and became depressed after his wife passed away. Plaintiff stated that he did not want to be around anyone and had panic attacks if he had to be in a crowd. (Tr. 48). Most anxiety medications did not work well and his options for different medications were limited while he was incarcerated. He testified that he had panic attacks daily while in prison. Plaintiff stated when he had a panic attack he could not breathe, he fell, and often passed out. (Tr. 49).

Plaintiff had a medical card to help him pay for medications. However, it only paid for about one hundred dollars of medication per month. Plaintiff stated he had to determine which medications he needed the most that month. He often chose the pain medications and did not have any medicine for his mental health. (Tr. 55). While in prison, plaintiff saw a psychiatrist once a month and a mental health counselor twice a month. (Tr. 57). The prison no longer had Tramadol for pain, so plaintiff was on the highest dosage of a nerve block medication called Neurontin. He did not feel as though the Neurontin helped with his pain. (Tr. 58).

8

Plaintiff testified that he was able to stand for fifteen to twenty minutes, could sit for about forty-five minutes, and walk a couple blocks before his legs began hurting. (Tr. 49-50). He felt he could carry about twenty pounds with his right arm but was unable to hold a glass of water with his left hand. (Tr. 50). He was no longer able to go fishing, play basketball, or work on motorcycles because of his injuries. Plaintiff would see his children and watch TV for fun before he was incarcerated. (Tr. 53). Plaintiff stated that he quit smoking and it had been three to five years since he last drank alcohol. (Tr. 53). The notes from when plaintiff was arrested indicated he had marijuana in a pill bottle but he denied the incident. (Tr. 60-61).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical question that assumed a person of plaintiff's age and work history who was able to do light work with a restriction of simple one to three step tasks, not involving more than occasional interaction with coworkers and supervisors, no interaction with the general public and no fast paced or strictly quota based work. (Tr. 62-63). The VE testified that the person could perform jobs that exist in significant numbers in the national economy. Examples of such jobs are laundry folder, sorter positions, and janitor positions. (Tr. 63).

The VE testified that if the person were limited to no repetitive activity with his hands it would eliminate all jobs. Additionally, there would be no work available for someone who passed out as often as plaintiff claimed. (Tr. 64). Upon questioning from plaintiff's attorney, the VE testified that if the person were limited to occasional use with one arm the jobs would remain. (Tr. 65).

### 3. Medical Treatment

Plaintiff has extensive medical treatment records. His first complaints of neck pain were in 2007 while at Menard Correctional Center. (Tr. 297-99). He had a decreased range of motion and the records indicate an X-ray showed narrowing at C5-6. (Tr. 302).

In October 2008, plaintiff presented at the emergency room after being hit in the head, back, and knees with a baseball bat. (Tr. 352, 405). He lost consciousness and had a posttraumatic seizure. His blood alcohol content level was .216 and he was sent to the ICU to be monitored. (Tr. 356-57).  Plaintiff had several X-rays and CT scans performed of his brain, cervical spine, thoracic spine, lumbar spine, right knee, right hand, chest, and abdomen. No anatomic injuries were noted, and the only abnormal findings were some degenerative changes at C5-6 with some spurring and mild degenerative changes at L1-L2. (Tr. 358-60, 385).

In February 2009, plaintiff was incarcerated again and treatment notes indicate Hepatitis C, seizures, and right hand pain due to a fall. (Tr. 420). He was given a lower bunk bed assignment at Menard Correctional Facility due to his seizures and diagnosed with cannabis dependence, schizophrenia, and bipolar II disorder. (Tr. 419-21). He was released later that year and saw Dr. Benito Bajuyo with pain in his left arm, shoulder, and left side of his neck. Dr. Bajuyo reported a limited range of motion in plaintiff's left upper extremity. (Tr. 555).

Plaintiff continued to see Dr. Bajuyo through June 2010. (Tr. 530-55). He repeatedly complained of chronic neck pain and was given medications for anxiety and pain relief. (Tr. 530-50). In February 2010, plaintiff had an MRI of his cervical spine

performed. (Tr. 472-73, 523-24). It indicated plaintiff had minimal cervical spondylosis, moderate to marked facet arthropathy, multilevel disc disease, mild central canal stenosis at C3-4, C4-5, and C5-6, and multilevel foraminal stenosis at C4-5 and C5-6. (Tr. 473, 524).

In June 2010, plaintiff went to the emergency room after a fall. He was diagnosed with a coccyx contusion but had a full range of motion in his arms and legs. (Tr. 626-27). He visited the emergency room again in November 2010 after he fell while carrying his grandson. (Tr. 636). While his grip strength was fair, a CT scan revealed spondylosis and a possible disc protrusion at C5-6. (Tr. 638-9). He returned to the emergency room once more in December 2010 after a seizure. Low anticonvulsant levels and alcohol consumption were thought to be the cause. (Tr. 655).

In September 2010, plaintiff began seeing neurologist Dr. Jacqueline Carter. (Tr. 484). She opined that plaintiff had a decreased range of motion in his cervical spine and slightly decreased strength in his left arm and leg. (Tr. 484-88). Her impression was that he had cervical spondylosis with radiculopathy at C6-7. (Tr. 488). Plaintiff returned to Dr. Carter in December 2010 after nerve testing was performed. (480, 520). Her impression was plaintiff had sensorimotor neuropathy and muscle contraction headaches. (Tr. 480). In 2011 Dr. Carter opined plaintiff had a decreased range of motion in his cervical spine, left arm and hand and she found no mental impairment. (Tr. 477). The only other records from 2011 were from an emergency room visit where plaintiff complained of neck pain and medication refills. (Tr. 651, 758-59). On examination at the emergency room, plaintiff had a full range of motion without pain in

his back. He was given a prescription for pain medication and told to soak his neck in warm water. (Tr. 653).

In 2012, plaintiff was incarcerated at Menard Correctional Center again. That April, he reported to the physician that he had neck pain for seven years. (Tr. 674). In June, he stated he had neck pain for fifteen years and could not turn his neck to the left. (Tr. 677). An X-ray revealed spondylosis at C5-6 and while plaintiff complained of pain in his left elbow he did not have a limited range of motion. (Tr. 678). In August, the Menard doctor noted post-traumatic cervical spondylosis with narrowing of C5-6 and gave plaintiff more pain medication. (Tr. 681).

In October, plaintiff told the doctors he could not hold anything due to his neck and shoulder pain and finger tingling and numbness. His neck had a limited range of motion and his grip strength with his left hand was decreased. Plaintiff requested a no work permit. (Tr. 794). He received a no work order through March 2013. (Tr. 795). Plaintiff also received psychiatric treatment throughout his time in prison. He was diagnosed with major depressive disorder with psychotic features, assigned a GAF score of 61, and given medication. (Tr. 798-808).

### 4. RFC Assessments

In November 2010, state agency psychologist Dr. M.W. DiFonso assessed plaintiff's mental RFC. She reviewed medical records but did not examine plaintiff. (Tr. 459-61). She opined that plaintiff was moderately limited in his ability to understand, remember, and carry out detailed instructions. Additionally, plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods,

interact appropriately with the general public, and accept instructions and respond appropriately to criticism from supervisors. (Tr. 459-60).

In December 2010, state agency physician C.A. Gotway assessed plaintiff's physical RFC. (Tr. 451-58). He also reviewed medical records but did not examine plaintiff. He opined that plaintiff could occasionally carry twenty pounds, frequently carry ten pounds, and stand, walk, or sit for six hours out of an eight hour workday. (Tr. 452). Dr. Gotway stated plaintiff should never climb ladders, ropes, or scaffolds, and should only occasionally, climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. (Tr. 453). He limited plaintiff to only occasional reaching overhead with his left arm and felt plaintiff should avoid concentrated exposure to hazards such as machinery and heights. (Tr. 454-55).

### 5. Consultative Examinations

Plaintiff had three consultative examinations prior to his alleged onset date. His first physical consultative examination was performed by Dr. Raymond Leung in June 2005. (Tr. 282-84). Dr. Leung's diagnostic impression was Hepatitis C. (Tr. 284). Plaintiff had an additional physical consultative examination performed in June 2006 by Dr. Vittal Chapa. (Tr. 285-88). Dr. Chapa noted plaintiff's range of motion and hand grip was good bilaterally. His diagnostic impressions were a history of Hepatitis C infection and a history of neck pain. (Tr. 287). In June 2006 plaintiff also had a psychological consultative examination performed by Dr. Harry Deppe. (Tr. 292-95). Dr. Deppe's diagnoses were polysubstance abuse in remission, alcohol dependence in partial

remission, personality disorder with antisocial features, and a GAF score of 50-60. (Tr. 295).

Plaintiff had two consultative examinations after his alleged onset date. In November 2010, Dr. Deppe performed another psychological consultative examination. Plaintiff told Dr. Deppe that he was previously a "hard drinker" but had last consumed alcohol twenty months prior. He stated he was previously incarcerated twice for DUIs, once for aggravated battery, and another time for possession of cocaine. (Tr. 415). Dr. Deppe's clinical impression was that plaintiff's ability to relate to others was only fair and his ability to understand and follow instructions as well as maintain instruction was intact. Additionally, he felt plaintiff's ability to withstand pressures and stresses day to day and his overall general prognosis was fair to good. Dr. Deppe diagnosed plaintiff with adjustment disorder with mixed emotional features, Hepatitis C, cirrhosis, seizure disorder, and a GAF score of 60. (Tr. 417).

In November 2010, plaintiff also saw Dr. Adrian Feinerman for a physical consultative examination. Plaintiff was taking Lortab and Klonopin and had decreased grip strength on the left side of 4 out of 5. (Tr. 429-31). Plaintiff had a decreased range of motion in both shoulders, weakness in his left upper extremity, and mild problems squatting and arising. (Tr. 432). Dr. Feinerman's diagnostic impressions were Hepatitis C, Cirrhosis, cervical disc disease with radiculopathy, and seizures. (Tr. 432-33). He opined that plaintiff's fine and gross manipulation with his left hand was mildly impaired. (Tr. 433). Dr. Feinerman's notes also include a chart indicating which fine and gross manipulation functions plaintiff had difficulty completing with his left hand. The

chart indicates plaintiff had mild impairments opening a door using a knob, squeezing a blood pressure cuff bulb, picking up a coin, picking up and holding a cup, and picking up a pen. (Tr. 434).

## Analysis

Plaintiff's first argument is that the ALJ erred by failing to recognize the change in alleged onset date which caused her to consider immaterial evidence. Plaintiff primarily takes issue with the ALJ's discussion of medical evidence from prior to the alleged onset date.

Plaintiff's arguments on this point are unsupported as it is apparent the ALJ amended the onset date in forming her opinion. The ALJ explicitly used the amended onset date when she posed her hypothetical to the VE and stated "claimant subsequently changed age category to closely approaching advanced age" in her analysis. Additionally, as the Commissioner notes, ALJs are required to consider all relevant medical evidence, including evidence from before and after an alleged onset date. SSR 83-20.

Plaintiff states that the ALJ relied upon stale and irrelevant medical evidence in forming her opinion. Plaintiff argues that the ALJ should not have discussed consultative examinations that took place years prior to the amended onset date. It would be improper for the ALJ to rely solely upon evidence that took place years prior to the alleged onset date; however, that is not what happened here. The ALJ discussed the consultative examinations from the prior years while also discussing the evidence from after the onset date. She does not state she relies upon the prior opinions, nor does

she state she gives them any weight. She merely discusses them in the overview of plaintiff's medical history.

Plaintiff primarily cites two cases in support of his contention that the ALJ erred in using the consultative examinations from prior to the amended onset date. This case and the cited cases are different for several important reasons. First, plaintiff cites *Furlow v. Astrue* where the ALJ did not have any consultative examinations on record after the amended onset date, and explicitly stated he gave controlling weight to the outdated examinations. 2011 W.L. 3555726 (S.D. Ill. Aug. 11, 2011). Plaintiff also cites *Clayborne v. Astrue* where it was held that "the probative value of medical evidence prior to the claimant's onset date may be significantly lessened when it is at odds with medical evidence collected after the claimant's onset date." 2007 WL 6123191 (N.D. Ill Nov. 9, 2007). In *Clayborne*, the plaintiff had no consultations after the amended onset date. Here, the ALJ does not state she gave any weight to the prior opinions, the bulk of plaintiff's medical records on file come from after the onset date, and the ALJ primarily incorporated findings from the records after the amended onset date.

Plaintiff states the regulations would mandate a finding of disability for plaintiff if his amended onset date had been used and he was restricted to sedentary work. However, the ALJ restricted plaintiff to light work, not sedentary work. Light work for an individual with plaintiff's amended onset date does not necessarily mandate a finding of disability. Additionally, as discussed above, there is no indication the ALJ did not actually amend the onset date to properly assess plaintiff's work capabilities.

Plaintiff also argues that even with a light work restriction, if plaintiff was unable

to repetitively use his hands bilaterally with his amended onset date he must be disabled. He cites the VE's testimony stating that if an individual could have no repetitive activity with his hands it would eliminate the available jobs. However, plaintiff fails to note the rest of the testimony from the VE, where she stated if one arm was limited but the other was not, the available jobs would remain. No doctors of record made any significant findings regarding limitations involving plaintiff's right arm or hand. The lack of limitations placed on plaintiff's right arm and hand in conjunction with plaintiff's amended onset date do not mandate a finding of disability.

Plaintiff's next two arguments involve the ALJ's RFC analysis. An RFC is "the most you can still do despite your limitations."  20 C.F.R. §1545(a).  In assessing RFC, the ALJ is required to consider all of claimant's "medically determinable impairments and all relevant evidence in the record."  *Ibid*.  "As we have stated previously, an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians. See *Diaz v. Chater*, 55 F.3d 300, 306 n. 2 (7th Cir.1995). Obviously, the ALJ cannot be faulted for omitting alleged limitations that are not supported by the record.

As plaintiff relies heavily on his testimony and self-reported complaints to doctors for his RFC arguments, it is important to note the ALJ's credibility analysis. The ALJ determined that since the record was "rife with inconsistencies, contradictions and objective findings (medical and otherwise) which detract his allegations" plaintiff was only marginally credible. Plaintiff did not challenge this determination and therefore waived any arguments regarding his credibility.

Plaintiff argues the ALJ erred in assessing plaintiff's cervical spine, left arm, and left hand impairments. He attempts to use treatment records as an indication that plaintiff's limitations were greater than the ALJ's RFC determined, but many of the treatment records cited note plaintiff's self-described complaints. As noted above, the ALJ appropriately did not find plaintiff credible.

Additionally, the objective evidence plaintiff cites fails to show that the ALJ should have established a more restrictive RFC. As the Commissioner points out, plaintiff does not identify any additional limitations that should have been included in the RFC assessment for his cervical spine impairments. The ALJ limited plaintiff to light work with physical restrictions regarding climbing, lifting and carrying. These limitations were supported by the state agency physician's recommendations and the objective medical evidence such as treatment notes and imaging results.

Plaintiff argues that the MRI taken in 2010 displayed marked to severe foraminal stenosis at two levels and several doctors confirmed he had a limited range of motion. The ALJ discussed plaintiff's MRIs, decreased grip strength, and decreased range of motion. (Tr. 20-26). Plaintiff's medical record also contains evidence that plaintiff at times had no problem with his cervical range of motion and some of his imaging results showed only mild degeneration. (Tr. 431, 472-3). The ALJ noted that when the doctors stated plaintiff had a decreased range of motion in his cervical spine they did not suggest any work related limitations resulting from that limited range of motion. (Tr. 21). While plaintiff argues otherwise, the ALJ undertook a detailed discussion of plaintiff's medical history on record and did not just note evidence in support of her

opinion. It is not the role of this Court to reweigh evidence and plaintiff fails to show any specific evidence that contradicts the ALJ's opinion regarding his cervical spine impairments.

Plaintiff also argues the ALJ erred in not creating a more restrictive RFC with regard to his left arm and left hand. He cites records that show he had a limited range of motion and decreased grip strength in support of the more restrictive RFC. Plaintiff also notes that Dr. Feinerman's assessment included a chart that displayed plaintiff had mild limitations regarding opening a door, picking up a coin, squeezing a blood pressure cuff, holding a cup, and picking up a pen. (Tr. 436). However, Dr. Feinerman did not include any opinion regarding plaintiff's limitations due to his mild impairments. Additionally, plaintiff's grip strength, while decreased, was typically a 4/5. Plaintiff fails to show how mild impairments in his hand and arm lead to a more restrictive RFC as no doctor of record indicated any significant restrictions were necessary.

While plaintiff argues that doctor notes indicating decreased grip strength, reported pain, and limited range of motion should indicate a more restrictive RFC this is not necessarily the case. As the Commissioner notes, the Seventh Circuit has indicated that an RFC cannot be overturned when none of the doctors indicated the claimant was unable to work or had an opinion that was inconsistent with the ALJ's determination. *See*, *Pepper v. Colvin*, 712 F.3d 351, 362-63 (7th Cir. 2013), *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010), *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010), *Rice v. Barnhart*, 384 F.3d 363, 370-71 (7th Cir. 2004). None of the opinions of the doctors on record contradict the ALJ's decision, nor do they indicate greater limitations are needed.

Therefore, the ALJ's decision regarding plaintiff's left arm and hand are affirmed.

The only opinion as to plaintiff's physical work capabilities came from Dr. Gotway. Dr. Gotway thoroughly explained why he did or did not impose restrictions in his recommendations. For example, he limited plaintiff to only occasional reaching with his left arm but no other limitations because he had decreased strength in the left arm but normal and symmetrical reflexes. (Tr. 452-58).

The ALJ stated she accepted Dr. Gotway's opinion because he produced a credible assessment of plaintiff's RFC and there were no treating source assessments or additional credible evidence in opposition. (Tr. 24). It is proper for the ALJ to rely upon the assessment of a state agency consultant. *Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005); *Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993). "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." Social Security Ruling 96-6p, at 2.   Here, the opinion of Dr. Gotway in conjunction with the medical evidence on record provides sufficient support for ALJ Thomas's RFC assessment.

The final argument plaintiff presents is that the ALJ failed to consider the combined effect of plaintiff's disabilities. Plaintiff's argument to this point is essentially a rehashing of his previous arguments. He focuses primarily on the ALJ's failure to explicitly state whether she considered a combination of plaintiff's impairments when forming her opinion that plaintiff could stand and walk for six hours a day and occasionally climb stairs. As the Commissioner notes, an RFC need only include

claimant's limitations to the extent they are supported by the record. *Pepper*, 712 F.3d at 363. Here, the evidence of record does not support a more restrictive RFC even when considering the combined effects as, again, most of plaintiff's argument relies upon his own testimony which was found to not be credible.

The ALJ provided an extensive review of the record in forming her opinion. She discussed how each of plaintiff's impairments did or did not lead to a restriction within the RFC. For example, the ALJ stated plaintiff had Hepatitis C but no clear diagnosis of cirrhosis was on record. Plaintiff's liver tenderness and pain, tiredness, and flu-like symptoms in association with Hepatitis C were accounted for by precluding any heavy or strenuous work. (Tr. 20). She clearly took each of his medically documented problems into account when forming the RFC and when it is looked at from a commonsensical standpoint her decision must stand. *Jones*, 623 F.3d at 1160.

In sum, plaintiff's argument on all of his points is, in effect, nothing more than an invitation for the Court to reweigh the evidence. However, the reweighing of evidence goes far beyond the Court's role. Even if reasonable minds could differ as to whether Mr. Williams is disabled, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot make its own credibility determination or substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## <u>Conclusion</u>

After careful review of the record as a whole, the Court is convinced that ALJ Thomas committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying David E. Williams's application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE:  April 22, 2015**                    **/s/  Staci M. Yandle**
                                                            **STACI M. YANDLE**
                                                            **DISTRICT JUDGE**